STATE, Appellee v. HARON et al., Appellants

(220 N.W.2d 829)

(File Nos. 11258, 11269. Opinion filed August 12, 1974)

Kermit Sande, Atty. Gen., Pierre, Marvin Keller, Deputy State's Atty., Sioux Falls, for the State.

Braithwaite & Cadwell, Joe W. Cadwell, Sioux Falls, for appellant Alfonso Boltiador.

Anderson & Quinn, Robert N. Quinn, Sioux Falls, for Charles E. Haron, appellant.

WOLLMAN, Justice.

Defendants were charged with the offense of unlawfully possessing a controlled drug, a quantity of marijuana in excess of one ounce, in violation of SDCL 39-17-95. They appeal from the judgment entered after they were found guilty by a circuit court jury.[1]

At approximately 8 a.m. on August 18, 1972, some 15 law enforcement officers, consisting of members of the Sioux Falls Police Department, the Minnehaha County Sheriff's Department and the Minnehaha County Civil Defense Unit, converged upon a farm located in the northwest corner of Minnehaha County for the purpose of executing a search warrant describing a certain Harley Davidson motorcycle which had allegedly been stolen from its owner by one Ron Nelson, also known as Ronald James Nelson. The officers were accompanied by a civil defense helicopter.

---

1. Defendant Haron's wife, Constance Louise Haron, was also named as a defendant. At the close of the state's case, the trial court granted her motion for dismissal based upon the defense of coverture, SDCL 22-5-3.

Upon reaching the farmyard, the officers drew their weapons and surrounded the farm house. Two police officers and Sheriff Gene Gruhlke went up on the back porch and knocked on the door. These three officers heard someone running in the house and then heard the sound of flushing water, where upon they knocked again, identified themselves as police officers, announced that they had a search warrant and asked that the inhabitants of the house open the door. As these three officers stood near the door they observed some green leafy substance on a tarpaulin which was lying on the porch.

Upon receiving no response to their second knock, the officers forced open the back door and entered the kitchen, where they saw some green leafy substance lying on the kitchen table. They also observed a trail of this substance leading from the table out through a doorway. One of the officers then looked through the partially opened bathroom door and observed an individual, later identified as defendant Boltiador, sitting on the stool clad only in a pair of pants, which were pulled apart four or five inches down below his waist. The officers ordered Boltiador to stand up and move, whereupon they observed some of the green leafy substance floating in the water in the stool. They recovered this substance, which was later determined to consist of .106 ounces of marijuana.

The officers then started to go upstairs, where they met defendant Haron at the top of the stairway. The officers then went into one of the rooms, where they found Mrs. Haron and a small child in bed. After Mrs. Haron and the child were taken downstairs, the officers searched the upstairs rooms and then looked into the attic through a door on the ceiling of the bedroom in which Mrs. Haron and the child were found. The door to the attic, approximately two feet by two feet in size, was lying slightly ajar at the time the searching officer opened it and looked into the attic. As this officer put his head and shoulders through the attic door and looked about with the aid of a flashlight, he observed a one-gallon can approximately three or four inches away from the door with some green leafy substance heaped up above the top of the can. The officer took the can into his possession; the can was later determined to contain 9.81 ounces of marijuana.

The officers took into possession the green leafy substance which was lying on the kitchen table, later determined to consist of .141 ounces of marijuana, and the green leafy substance which was lying on the tarpaulin on the back porch, which proved to consist of 26 ounces of marijuana. The officers found neither Ron Nelson nor the motorcycle during the search of the house and the other buildings on the premises.

Defendants contend that the affidavit upon which the search warrant was issued was insufficient to establish probable cause for the issuance of the warrant. With the exception of the caption, the affidavit is set forth below.[2]

Defendants claim that the affidavit fails to meet the requirements of Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723, and Spinelli v. United States, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637. Under the *Aguilar-Spinelli* test, an affidavit based upon information supplied by an unnamed

---

2.  "Comes now James McKelvey and being first duly sworn deposes and states he is a detective member of the Sioux Falls Police Department and makes this affidavit in support of his request for a Search Warrant.

"On or about August 4 or 5, 1972, a 1950 Harley Davidson motorcycle, Serial Number 50FL2451, South Dakota License Number MC 1817, for the year 1972, black in color and owned by one Ronald Schultz was stolen from a locked garage located at 523 South Western Avenue, Sioux Falls, Minnehaha County, South Dakota.

"On August 7, 1972, Gary Muna and Roger Munce reported to the Sioux Falls Police Department that they had, on the 4th day of August, 1972, observed two men in the area of the locked garage where such motorcycle was stored. Said two men were interested in the motorcycle and appeared to examine the padlock on the garage door.

"One man believed by Gary Muna to be RON NELSON was described as 5'10", 170 to 175 pounds, blonde hair which covered the ears and having a mustache. The other one was described as 5'11" to 6', 170 to 180 pounds, shoulder length black hair and wearing a beard.

"On the 11th day of August, 1972, Roger Munce and Gary Muna examined a series of photographs at the Sioux Falls Police Department and each of them positively identified RON NELSON as the blonde haired man described above.

"On the 9th day of August, 1972, one Keith Brady contacted the Sioux Falls Police Department and told Detective James Green that on the 9th day of August, 1972, he had seen RON NELSON riding a motorcycle, known to him to be the one owned by Ronald Schultz, on a gravel road near Humboldt, South Dakota. Such gravel road is located adjacent to a farm near Humboldt, South Dakota, and has been described to your Affiant by Keith Brady and other persons. From such description your

informant must include facts from which the magistrate can find that the conclusions set forth in the affidavit are warranted. The affidavit must set forth sufficient facts to allow the magistrate to conclude that the informant's information is reliable and that the informant is credible.

The *Aguilar-Spinelli* requirements have been held not to apply to information supplied by identified bystanders or victim-eyewitnesses to a crime. For example, in United States v. Bell, 5 Cir., 457 F.2d 1231, the court stated that:

> "It is now a well-settled and familiar concept, as enunciated by *Aguilar* and *Spinelli*, that supporting affidavits in an application for a search warrant must attest to the credibility of an informant and the reliability of his information. *See also* United States v. Harris, 403 U.S. 573, 91 S.Ct. 2075, 29 L.Ed.2d 723 (1971). We have discovered no case that extends this requirement to the identified bystander or victim-eyewitness to a crime, and we now hold that no such requirement need be met. The rationale behind requiring a showing of credibility

Affiant has determined that the same is described as the NW ¼, NW ¼ Section 7, T 104N, Range 52 W, Minnehaha County, South Dakota.

"Your Affiant has received information from Keith Brady and Ronald Schultz that RON NELSON frequently visits and stays at the farm above described. Your Affiant knows that other persons, including Chuck Herron with whom RON NELSON frequently associates, spent substantial time at said farm. Ronald Schultz informed your Affiant that he was at such farm and saw tire tracks similar to the tread on his motorcycle leading to a barn on said property.

"Based on all the foregoing, your Affiant has probable cause to believe and does believe that RON NELSON committed the offense of Grand Larceny on or about August 4 or August 5, 1972, and now has in his possession upon the above described premises a 1950 Harley Davidson Motorcycle, Serial Number 50FL2451, South Dakota License Number MC 1817, for the year 1972, black in color.

"WHEREFORE, your Affiant requests this Court to issue its Search Warrant allowing and permitting any member of the Sioux Falls Police Department or any other law enforcement officer to enter the premises located at and described as NW ¼, NW ¼, Section 7, T 104N, Range 52 W, Minnehaha County, South Dakota, for the purpose of searching the said farm for the 1950 Harley Davidson Motorcycle, Serial Number 50FL2451, South Dakota License Number MC 1817, for the year 1972, black in color, and seizing the same, and return to this Court such property obtained as a result of such search.

"Dated at Sioux Falls, Minnehaha County, South Dakota, this 17th day of August, 1972. /s/ James H. McKelvey"

and reliability is to prevent searches based upon an unknown informant's tip that may not reflect anything more than idle rumor or irresponsible conjecture. Thus, without the establishment of the probability of reliability, a 'neutral and detached magistrate' could not adequately assess the probative value of the tip in exercising his judgment as to the existence of probable cause. Many informants are intimately involved with the persons informed upon and with the illegal conduct at hand, and this circumstance could also affect their credibility. None of these considerations is present in the eyewitness situation such as was present here. Such observers are seldom involved with the miscreants or the crime. Eyewitnesses by definition are not passing along idle rumor, for they either have been the victims of the crime or have otherwise seen some portion of it. A 'neutral and detached magistrate' could adequately assess the probative value of an eyewitness's information because, if it is reasonable and accepted as true, the magistrate must believe that it is based upon firsthand knowledge. Thus we conclude that *Aguilar* and *Spinelli* requirements are limited to the informant situation only." 457 F.2d 1231, 1238.

See also United States v. Roman, 4 Cir., 451 F.2d 579; United States v. Unger, 7 Cir., 469 F.2d 1283; United States v. Rajewich, 8 Cir., 470 F.2d 666.

■ We agree with the holding in United States v. Bell, supra, that the strict requirements of *Aguilar* and *Spinelli* are limited to those cases in which the information in the affidavit has been supplied by an unnamed, unidentified informant and that where, as in the instant case, the information, or at least the greater part of it, has been supplied by the victim of the alleged crime or by identified eyewitnesses, the reliability of the information so supplied and the credibility of the informants are sufficiently established if on the face of the affidavit it appears that the named victim-eyewitness informants were in a position to have observed the matters related to the officer who submits the affidavit to the magistrate.

Defendants contend that the affidavit was based upon stale information and that because of the absence of any information in the affidavit that Ron Nelson resided on the premises there was not probable cause to believe that the motorcycle would be found on the premises described in the affidavit. In support of this contention defendants cite United States v. Bailey, 9 Cir., 458 F.2d 408, in which an affidavit that merely stated that defendant Bailey had been seen at a certain house and that a codefendant had been arrested there did not establish probable cause to search the house for Bailey.

We believe that the majority in the *Bailey* case read the affidavit there in question in a very technical, restrictive manner. Moreover, we believe that the affidavit in the instant case, when given a fair, commonsense reading, indicates a course of conduct on the part of Ron Nelson that was sufficient to establish probable cause to search the premises in question. We must remember that only the probability, and not a prima facie showing, of criminal activity is the standard of probable cause. See Spinelli v. United States, supra. We believe that the affidavit, read as a whole, indicates that Ron Nelson's association with the premises in question was sufficiently continuing to justify the magistrate's conclusion that a reasonable probability existed that the motorcycle would be found on the premises. See Bastida v. Henderson, 5 Cir., 487 F.2d 860.

Given the reliability of the information supplied to the officer and the credibility of the informants, we conclude that the information contained with the affidavit was sufficient to establish probable cause for a search of the farmyard and farm building in question. Affidavits for search warrants are to be tested and interpreted by magistrates and courts in a common-sense and realistic fashion. United States v. Ventresca, 380 U.S. 102, 85 S.Ct. 741, 13 L.Ed.2d 684; United States v. Harris, 403 U.S. 573, 91 S.Ct. 2075, 29 L.Ed.2d 723; State v. McCreary, 82 S.D. 111, 142 N.W.2d 240; State v. Kietzke, 85 S.D. 502, 186 N.W.2d 551.

In holding that the affidavit was sufficient, we recognize, of course, that a reading of the affidavit raises a number of questions. For instance, how close was Ron Nelson to the farm in

question at the time Keith Brady saw him riding the motorcycle on August 9, 1972? What was the date on which Ronald Schultz was at the farm and saw tire tracks similar to the tread on his motorcycle? Who else was at the farm at the time? When was the last time that Ron Nelson was known to have stayed at the farm?

■ We think that these questions could very well have been asked by the magistrate at the time the affidavit was submitted to him. A neutral and detached magistrate should not serve merely as a rubber stamp for the police. United States v. Ventresca, supra. It is far better for an officer to be required to return to his typewriter for an hour in order to submit a more detailed affidavit than it is for him to later spend three additional days in court—better in terms of police efficiency, better in terms of judicial economy, and, most important, better in terms of insuring that search warrants will be issued only upon the fullest showing of probable cause that the police are able to submit to the magistrate, commensurate with the time available and the exigencies of the situation. We think that the following language, quoted by the appellate court from the trial court's decision, is instructive:

> " 'Assistance by the magistrate in preparing an affidavit containing sufficient facts to make an independent judgment as to the existence of probable cause does not detract from his neutrality. It demonstrates it. His duty is not to "rubber stamp" conclusory allegations, but to require adequate factual details or underlying circumstances. Neither does "detached" mean that he must remain mute, and simply accept or reject an affidavit. Due process does not require the police officer to keep presenting affidavits until he hits the mark or the contraband sought disappears.' " Albitez v. Beto, 5 Cir., 465 F.2d 954, 956.

We do not mean to imply, of course, that the magistrate should engage in the actual preparation and typing of the affidavit, see United States v. Steed, 9 Cir., 465 F.2d 1310; rather, the magistrate should stand ready to ask those pointed, germane questions that a fair reading of the affidavit raises in his mind.

█ Defendants argue that the search warrant was a mere pretext on the part of the officers to conduct a full-fledged drug raid at the farm. There was testimony by certain of the officers who participated in the execution of the search warrant that they approached the farm house with their weapons drawn because they were apprehensive of Ron Nelson. Indeed, before the three officers who went up on the back porch to knock at the door actually made any attempt to enter, their colleagues surrounded the house and stood guard with drawn weapons. We cannot say that the trial court erred in concluding that the officers had not in fact gone out to the farm for the purpose of searching the house for drugs. We are not prepared to say on the basis of this record that it would have taken 15 armed law enforcement officers accompanied by a hovering helicopter to subdue two unarmed men, a woman and a sleeping child.

We conclude, then, that defendants' attack upon the validity of the search warrant and the conduct of the police in executing the warrant is without merit.

Defendant Boltiador contends that at the most the evidence justified his conviction only of the misdemeanor offense of possession of marijuana in a quantity of one ounce or less. SDCL 39-17-96.

The evidence revealed that defendant Haron and his wife had leased the farmstead from a Mr. Graham in May of 1972. Mr. Graham testified that he had visited the farmstead on the day before the search for the purpose of showing the buildings to a prospective purchaser and had seen defendant Boltiador sitting on the back steps of the house. Defendant Boltiador asked Mr. Graham where defendant Haron was and told Mr. Graham that he would like to locate the Harons.

Defendant Boltiador contends that in view of his recent arrival at the farm, the lack of direct evidence that he had knowledge of or dominion and control over the marijuana hidden in the attic and located on the tarpaulin on the back porch leads to the conclusion that the evidence was as consistent with his hypothesis of innocence on the charge that he was in possession of the greater quantity of marijuana as it was with his guilt on such charge.

 The jury was instructed that either of the defendants could be found guilty of possession of marijuana in a quantity of less than one ounce. However close the question, the jury could very well have concluded, as it did, that in view of Boltiador's hurried attempt to dispose of a portion of the marijuana in response to the officer's announcement and request for entry, he was in fact in joint possession of a quantity of marijuana in excess of one ounce, whether it was the marijuana on the back porch and in the attic, or of either of such quantities. We think that the evidence, both circumstantial and direct, so linked defendant Boltiador with possession of the greater quantity of marijuana that the inference of his guilt of the charge of possession of more than one ounce could fairly be drawn. State v. Kietzke, supra.

The convictions are affirmed.

All the Justices concur.